Thank you, Your Honor. Good afternoon, and may it please the Court, my name is Stan Berman of the law firm of Keller Irwin, and I represent Pacific Gas and Electric Company, or PG&E. From November 2000 through June 2001, the California Independent System Operator, or ISO, properly billed its customers under its tariff, under the Neutrality Adjustment Clause of its tariff, Section 11.2.9, for over $100 million in costs associated with energy exchange transactions entered into during that period. Sometime after those transactions were over, in August 2001, the California ISO had second thoughts about the way that it billed those charges to its customers. The ISO made a filing at FERC in August 2001, after all the transactions were over, to explain its new methodology for billing the costs. And FERC put out an order, October 17, 2001, addressing the ISO filing. Now, so an amateur like me can follow you along when you say they made the filing, are you talking about Amendment 51? No, Your Honor. So tell us what you're talking about as you go along, just for those of us who are new to this game. I'm sorry, Your Honor. The issue here is whether the California ISO engaged in retroactive rate-making when it filed Tariff Amendment 51. That might be the substantive issue, but I thought the main issue was whether this was a collateral attack, whether we should reach the merits or not. Isn't that the underlying main issue? Your Honor, you're correct that the main issue raised by FERC, and also an issue raised by the ISO, is the issue of collateral attack, which is why I referred to the August 2001 filing. That's because the August 2001 filing was in docket ER01-2886. That is the seminal case that FERC and the ISO cite to for the proposition that we're collaterally attacking prior FERC orders. Okay, so now you're referring to the August 2001? Is that what you said? The filing was made in August 2001, and FERC ruled on it as October 17, 2001. Okay, so it's an October 2001 order. That's the first order you're talking about. Okay, go ahead. Yes, Your Honor. I'll note that FERC then cites several other orders that it says that we're collaterally attacking, but in general, those other orders cite back to the October 17, 2001 order, because in those orders, like in the orders in the Amendment 51 case, FERC did not address the substance, but said we were collaterally attacking the prior order or referred back to the prior order that was entered October 17, 2001. That's why I believe that all the answers to this case can be found if we look at the order that was entered October 17, 2001, which I've enlarged right here, and I believe that we'll find that when we look at that order, which is the root of everything that FERC and the ISO argue, you'll see that in fact, PG&E is correct, and that we're not collaterally attacking that order. I have a question. Now, you have the neutrality adjustment charge, and then it was changed to the, what's it called, the negative uninstructed imbalance energy, correct? Yes. Total negative uninstructed. Now, the neutrality adjustment charge was a disadvantage to the person that caused to have to get power, then it was returned later in like two times the amount, correct? And so it ended up as penalizing the parties in the return period that may have had nothing to do with the need initially, correct? Your Honor, I would say that the neutrality adjustment charge spreads evenly over the market, the cost of the transaction. All right, but the argument is that, but if you were a person that had nothing to do with the power being needed, you would say, well, I'm having to pay for something that I wasn't the cause of, right? That's an argument that might have been made, and I think that's the reason the ISO decided after the fact retroactively to change their methodology. Well, because, just so that I understand the context of this, now, I noticed at a couple of different places in all the documents that I have, PG&E was claiming it was worth $80 to $100 million, and another place $100 to $200 million. If, since the change went from the neutrality adjustment charge, which I'm assuming PG&E considered that was a favorable way to PG&E, am I correct in assuming that PG&E was responsible for more of the power needs than some other people that are involved here? Under the bogus auction results from this period, PG&E was found to be responsible, but the auction results that led to that were bogus, and FERC has found that, because the auction results, which decided whether you bought power in the PX forward market or the ISO real-time market, FERC has found in the refund proceeding that Judge Thomas is very familiar with, that those auction results were based on unreasonable prices during the period at issue here. So, to say that any particular party was responsible for the charges, or was the one who should have been buying the power in one market versus another market, is to accept the auction results that FERC has found to be unreasonable. So, I would say, Your Honor, no, it's not reasonable to conclude that PG&E, more than any other market participant, was responsible for the charges that were incurred. Mr. Berman, you start out by referring to this October 17 order, and I guess you've given us copies of it, as well, to put on the board, but this refers only to the BPA agreement, right? And I assume you're going to take us through how this came to apply more generally. Yes, Your Honor. Well, the issue is that when the ISO came up with its new methodology, it filed the BPA agreements, which doesn't reference the new methodology, but in the cover letter in which it submitted the filing, it referenced the new methodology. So then FERC put out an order, and in the order, as you can see, FERC accepted the agreement, but it doesn't reference the change in methodology that was referenced in the cover letter. So, the contrary... Give us the name of the new methodology. The new methodology is the imbalance energy methodology, or the uninstructed deviation methodology. Judge Callahan gave another name. I don't know the other name. Negative uninstructed imbalance methodology, or whatever. But we're talking the same thing. It's something different than the neutrality charge. And what you'll notice, that in the when FERC was ruling on this filing by the ISO, where the ISO mentioned its proposed change in the cover letter, FERC noted the way the charge was assessed to customers, and FERC said, the ISO recovers costs associated with these transactions under its neutrality adjustment charge mechanism. It doesn't propose... This order does not accept a change to the methodology. It instead accepts only the agreement with BPA. And the agreement with BPA was proposed to be effective January 2001, whereas the change in methodology was effective November 2000. But this says it goes back to January 2001. I also note that on the second page of the order, the FERC specifically says that it's not approving any change in rate charge classification, and makes clear that they're not accepting a change to the ISO tariff. They're simply adopting the mechanism that was already in place. The mechanism that was already in place is the neutrality adjustment charge method. I submit that if you look at the refund proceeding, and the orders that FERC cites to say that they've already decided this in the refund proceeding, what you'll find, if you look at, for example, paragraph 536 of the December 12th order, is that there, the presiding administrative law judge said that the methodology to be applied to energy exchanges is the methodology that was adopted in docket ER01-2886, which is this order. Then in the October 16th, 2003 order, footnote 17... I just meant October... October 16th, 2003. 2003... Footnote 17, which is the order on rehearing in the refund case. Is that the ALJ order? That's the order on rehearing where the commission was reviewing the ALJ order. All right. In that case, the commission clarified, or repeated, that it was adopting the methodology accepted in ER01-2886. But when you look at docket ER01-2886, the only order that was issued in that case was this letter order, which applies to the neutrality adjustment charge mechanism. It does not, again, does not accept any change to the methodology. And really, that's our case. We're relying on the neutrality adjustment charge mechanism. Every argument they make claims that it was changed in this case. So you filed for a reconsideration of a certain order, right? Is that right? Your Honor, I'm not sure I understand the question, because we've filed for reconsideration of orders in the Amendment 51 case. Well, what I kind of get at is, you know, I'm not using the right phraseology, but all right, so when did it first... Your claim is that this change in methodology first came to your attention when? Your Honor, this order didn't put anything to our attention, because this order says that they're going to use the methodology that we want, the neutrality adjustment charge methodology. It was during the refund case in discovery that we learned that the ISO intended to use a different methodology. We sought clarification of that with the presiding judge, and the presiding judge said, in its order, without addressing the substance, we should use the methodology spelled out in this order. Then we sought rehearing, and the commission said, use the methodology that was spelled out in this order. Then the ISO filed Tariff Amendment 51, filing a tariff amendment, proposing to change the methodology to the methodology it wants to use now, not the neutrality adjustment charge. We complained and said they should be using the neutrality adjustment charge. And FERC said in response, we've already ruled against you. So is it your position that the first notice you had of this new methodology was the proposed Amendment 51? Your Honor, in the refund proceeding, we came to understand that Well, through some discovery, as you say, through some discovery, you learned somebody was using or contending they could use this different methodology. Through discovery in the refund proceeding, we learned that What did you discover? I mean, correspondence? Or an order of the commission, or what did you discover? We discovered, through discovery requests, to understand the way the ISO was doing its charging out various costs for its refund calculations. It wasn't doing anything with the energy exchange costs. Let me ask the question differently. When did you first find out that some people took the position that this new methodology had already been authorized by the commission? I believe that in the refund proceeding, the ISO made the argument that it had been previously authorized in this docket. We said, that's ridiculous. This docket approved our methodology, not theirs. The ISO, or excuse me, the commission in its orders, never addressed the substance and simply referred back to this docket. Every order that is cited to, if you read the orders, every order simply cites back to this docket and says that it's using this. I'll note that the refund proceeding was not final, in fact, was pending on rehearing in those orders while the tariff of Edmund 51 proceeding was filed. So what are you challenging in your other Ninth Circuit case? In the other Ninth Circuit case, Your Honor, we've briefed and have argued a different issue relating to energy exchanges, which is that FERC did not order the energy exchanges to be mitigated, and we've argued that the energy exchanges should be mitigated. If we were to prevail on that, that would substantially reduce the number of dollars that have to be assessed to customers here, because instead of a lot of dollars, they would be mitigated back down to reasonable levels. Right now, the energy exchanges, unlike other energy charges, are being charged at the inflated prices of the period, rather than at the lower prices that FERC later found to be just and reasonable. So this isn't just a second bite at the apple? Your Honor, this is not just a second bite at the apple among other things, because it wasn't until this case that the ISO included this proposed change in the tariff amendment. This is tariff amendment 51. The ISO, for some reason, thought it needed to file a tariff amendment in 51 to address this change, and I believe it's because of the ambiguity of the prior orders that simply refer back, the refund proceeding refers back to this order, this order meaning the October 17, 2001 order, and the October 17, 2001 order merely adopts the old methodology that PG&E wants us to adopt. Why couldn't you have raised this new methodology issue in the refund proceeding? Your Honor, quite frankly, we tried to, and in response, the Commission responded that, the Commission responded, but its response was that it would not look at the substance. It said, we already addressed this in DOCA ER-012886, we're not going to look at it again, we're going to use the ER-012886 methodology. And that's not an order from which you could have petitioned for review? Your Honor, we were able to petition for review from the October 16, 2003 order, which came out after amendment 51 was filed, and after we had filed our protests of amendment 51. I would note that if you think that there's some confusion as to which case we should be pursuing this in, that's not a reason to dismiss our case. We shouldn't be whipsawed by finding that we cannot raise the argument anywhere. At the very least, you should simply hold the matter in abeyance in one of the proceedings so that we can pursue our issues somewhere, because somewhere we deserve the right to argue that this letter order actually adopts our methodology and is flatly inconsistent with the claim that some different methodology should be used. Well, you deserve that opportunity only if you haven't had that opportunity earlier, right? I mean, that's this case, I assume. Well, I believe that this is the right case to raise the issue in, Your Honor, because this is the case where the ISO filed the tariff amendments seeking to make the change, and where it was appropriate for us to say it's illegal retroactive rate-making because the change was made after the time the service was taken. Very good. Any further questions? Your Honor, I note that I appear to have... Thank you, Your Honor. Thank you. May it please the Court, I'm Michael Ward of the law firm Austin & Byrd in Washington, D.C. I represent the California Independent System Operator Corporation, also known as the ISO. In addition to answering any questions you have at this time, I'd like to spend my time briefly just to review the circumstances that gave rise to the Commission's orders under review, the defects of those orders, and the inadequacy of the Commission's response before this Court. This proceeding arises from an order of the Federal Energy Regulatory Commission prohibiting the ISO, under the terms of its tariff, from recovering costs that were incorrectly paid to generators for services that the generators have not actually provided. As you're aware, the ISO administers the majority of the transmission system in California. As part of that responsibility, it needs to maintain the reliability of the transmission system, and in order to maintain that reliability, it has to be able to increase the generation of electricity in a matter of seconds, often. For example, if a generator or a major transmission line fails, the ISO must immediately replace the electricity that was provided by that generator or through that transmission line. In order to keep that ability, the ISO makes arrangements with generators to maintain a certain portion of their energy capacity unloaded, available, as reserves to the ISO in the event of an emergency. These reserves are called ancillary services, and the ISO procures the ancillary services through its auction markets. Of course, for the capacity to be useful to the ISO, it must remain unloaded or unused. The ISO tariff has always required that ancillary services be available when called upon, that they be unloaded in order to be paid for. Fortunately, from 1998 to 2000, a number of generators sold the ancillary service to the ISO and then turned around and generated electricity from that same capacity which they sold in the ISO's markets. Because the ISO's settlement process was automated, those generators were actually paid for that ancillary services that they didn't deliver. Under the ISO tariff, however, the ISO has the ability, and has always had the ability, to rerun its markets to correct errors. When the ISO determined that the generators had been paid for ancillary services that they had not in fact provided, the ISO determined that it was going to rerun its markets to recover those payments. The tariff does not require that the ISO seek permission from FERC in order to rerun its markets. The Commission orders in question here arise, as you are aware, from Amendment 51 to the ISO tariff, which the ISO simply proposed to modify the invoicing process for its settlement reruns. The ISO, in filing Amendment 51, did not ask the Commission to do anything except to approve its modified invoicing process. The Commission did in fact approve that process, but didn't stop there. Following the approval of the Amendment, the Commission issued orders that prohibited the ISO from conducting certain refunds. I'd like to repeat that this authority to conduct refunds existed before Amendment 51 to the ISO tariff and was not dependent upon Commission permission. In preventing a rerun, the Commission stated that the issues raised by Amendment 51 and by the rerun were being addressed in its own investigation to gaming.  The ISO explained that to the Commission in its request for rehearing. Yet in denying rehearing, the Commission merely stated the ISO was attempting to expand its investigation into gaming. The Commission never addressed the ISO's arguments, and as a result, I can't explain to you today the errors in their reasoning, and you have no ability to examine them because the explanation is not there. But the question in this case is, should we examine it, right? That's what I was shortly turning to, Your Honor, which now, not having explained it, and left you without the ability to understand the arguments, the Commission tells you they can't review the explanation because their hearing, their order, which denied the ISO's authority under the ISO's tariff, its pre-existing authority, was a decision not to institute enforcement action. The error there is that the ISO never requested that the Commission institute enforcement action. The ISO did not need the Commission's authority to institute enforcement action. The authority to investigate. That's correct, Your Honor, and we did not ask the Commission to investigate. The ISO had already conducted its investigation and would have proceeded under its tariff authority to recover these payments. It did not need the Commission to conduct any investigations or to take any action in order to conduct these reruns. The ISO simply filed a very limited tariff amendment to revise its invoicing process. The Commission's attempt to use this proceeding to limit the ISO's tariff authority is not only unexplained, but it's unauthorized because it went beyond the scope of the proceeding. As a result, the Commission's order is both beyond its authority and arbitrary and must be reversed. I will reserve the remainder of my time and the Commission will have additional questions. Also, if you have any questions about our intervener's brief, that's not what I'm here for, but I certainly will answer them. I do have one question. If you were permitted to proceed, then wouldn't the affected entities that they could protest the rescission by filing complaints for the Commission leading inevitably to expenditure of Commission resources? They could, Your Honor, if they indeed felt that the recovery was incorrect. But since the recovery occurred under the ISO tariff, I don't think that it's appropriate to reject the ISO's ability to operate under its tariff because of the potential that the ISO authority might be later challenged. Well, doesn't the Commission have a right to make some sort of decision about how they want to spend their resources? The decision was not yet before the Commission. It did not even know. It's purely hypothetical. The Commission had no idea what it was doing in terms of expending its resources. If I can use an analogy, Your Honor. If I am charged by a merchant on my credit card for goods that the merchant can't deliver, and doesn't deliver, the credit card company is entitled to and should make adjustments to my credit card bill and my billing regardless of whether the government decides to pursue the matter as a fraudulent effort on the part of the merchant. That's what we have here. The ISO is simply operating to correct the billing statements under its own tariff. But then all the disputes to that would go to the Commission, right? In the same way any disputes under a credit card company's operations would go to the Commission. So they wouldn't have a right to say, no, we're handling this whole energy crisis situation and we don't want to spend our resources dealing with that? These weren't even energy crisis circumstances. These were tariff violations that occurred prior to the energy crisis from 1998 to 2000 that the Commission never even examined in deciding to issue the Show Cause Order. The Commission's staff report on the Show Cause Order just started looking at January 1st, 2000 forward. So the Commission actually never even considered these orders. Thank you. Your Honors, my name is Patrick Lee. I'm here for the Commission. And this case basically concerns a couple of orders and a multiple number of orders and proceedings that were before FERC. Now, despite the fact that the Commission's staff report and the petitioners want to make it seem like it's a very overly complicated situation, but the facts that they're presenting are a very limited version of it. First, I would like to address the CalISO's issue regarding the heckler v. Cheney situation here. As Judge Callahan, you just mentioned, ultimately this decision is a determination of whether or not there was a violation of the double selling by marketers and generators. In FERC's Enron Show Cause proceeding, and it was not just about Enron, but various other entities, the Commission determined that there were four entities after evaluating mountains of evidence and basically determined that there were four entities that it felt should be disgorging its unjust profits for the double selling. It made a determination that it would marshal its limited resources and address those parties only. When I say address it, you mean by instituting some kind of proceeding? The proceeding was underway and the proceeding is still continuing. The Commission determined that that was a gaming violation. It specifically determined that there was a violation of the MMIP and tariff there. The CalISO is basically making it seem like this is some sort of Scribner's error in which they could just willy-nilly flip a switch and voila, they can correct everything. Actually, the FERC has to make its determination whether or not there was a violation and whether it wants to spend its limited resources and enforce these violations. In the Show Cause proceedings on the double ancillary sales, it spent its limited resources and determined that it would only focus on a specific time period, which was January 2000 to June 20, 2001. I don't think you're arguing you don't have the authority to prosecute when you choose to prosecute or try to limit your enforcement. What their argument is, is that we never ask for enforcement. We can make those determinations and there's a remedy through FERC if we make them incorrect. No, I wouldn't disagree, Your Honor. They're basically trying to turn the environment on. If they could do this on their own, they would have done it, but they haven't done it. The whole fact that they say they have this authority, but they haven't done it means one thing. They have to come to FERC and get FERC's authority as to whether or not there was a double sale violation. I understand they haven't acted yet, but they've shifted their argument a bit and I understand it's a slightly different argument than historically, perhaps. Judge Collins, you just mentioned that the entities that would be found to have violated or done this double sale would then come to the Commission and file a complaint against these entities. The Commission would then be determining whether or not there had been a violation of the tariff and whether there had been a double sale of ancillary services. At its core, the whole issue is about whether or not FERC is going to enforce, spend its limited resources and investigate and enforce whether or not there had been a violation of the tariff and the FPA. So your argument is you can't really correct the errors without investigating to see if there's been a double selling and the investigation or the prosecution part of it is FERC and FERC has decided that it's going to put its limited resources and concentrate it on certain marketers and generators. There are four of them that it specifically found that should be the ones targeted. But now CalISO wants to do it because then they could get some money and then if the people contested it then FERC would have to deal with it. CalISO believes it's got some sort of authority to do it but the thing is the FERC has to determine whether or not there had been a violation of the double sale.  essentially by FERC whether or not there had been. Are you really saying or do you agree with them that they could go ahead and do something and file? Even though you've taken the position you're not going to prosecute, you're not going to investigate, you're not going to find any violations. Do you think the day that CalISO could go out and say alright now we're going to make these tariff adjustments and if the affected parties want to alleviate it for a quick payment. Is that what you're saying? I can't make any scattering of votes or rationalizing on my part. I would say that what it is is they're encroaching upon FERC's... Is there any easy place to look to to say who has the authority to do that? Or then are we back into that FERC makes the interpretation of who has the authority to do it and FERC is entitled to deference Is that how it works? On compliance orders and on also tariff filings. The question is on whether FERC gets to co-opt every other procedure by deciding it's going to initiate a show cause or enforcement action. That's because FERC is the enforcement authority here it's not the ISO. And under the FDA section 307 FERC has discretion as to whether or not on its investigations. But they aren't quarreling with your discretion. They just said their argument today is that they have the authority to act despite that and then you have the authority to review that. The arguments today are passing. Well the thing is that what they're saying inherently gets to FERC's domain of enforcement authority and FERC has already determined that it's not... If you don't think they have the authority to do it you should just say so. You're basically saying well they haven't done it, it's an end around we have discretion. If your position really is that they don't have the authority to do what they propose to do today which is to go and adjust the tariffs on their own you should just say that. Is that FERC's position or not? Well FERC's position is stated in its order and the first position there is one what they're going to say basically that there was another proceeding the Enron Show Cause proceedings that governed this and that we have a situation of heckler be chaney arising here and that FERC's discretionary enforcement authority is being prescribed here. Now the other point is that this is essentially a collateral attack on those Enron Show Cause orders about the double ancillary sales. So beyond that I mean our brief basically goes with the essential argument is that it's a heckler be chaney situation. With PG&E the issue is there are many proceedings going on here but at its heart it is a collateral attack and it's very simple. We don't have to worry about the retroactive rate making the notice issues because it's the collateral attack situation that we should look at. They show this BPA adjustment order and talk about the traffic adjustment charge mechanism being the one that's actually being forced Now the filing in the BPA filing clearly indicated that the negative imbalance the CT 1487 mechanism that's what it is, is the one that is being implemented. Now FERC's order in ERO 2886 approved that mechanism. Then in the California refund proceeding So he should have done quite the same in the California refund proceeding. You have to agree with that? Well for example mitigation measures in the California refund proceeding Mitigation measures was an issue now but the thing is in the underlying in the FERC proceeding in that docket, specifically the California parties in their request for a re-hearing raised the issue of cost allocation and CT 1487 the format in which, that they're objecting to right now that was specifically raised in the request for a re-hearing and the fact that they may or may not have raised that on their petition for review in the proceeding that is currently before the court in the other case that was their problem. They failed to note their argument. Basically what you're saying is that was your argument apparently that they needed to do it in the refund proceeding. They didn't do it. They waived it. They can't do it here. Is that what you're saying? Because then in fact they don't have an opportunity to litigate this on the merits ever. That's because they failed to raise the to seek petition for review then. I'm not here to be their attorney they fail to Well that would be the collateral attack that they failed to address that issue in their prior proceeding In the refund proceeding it's clear that they raised the issue in the request for a re-hearing before the commission they specifically mentioned the CT 1487 method and they had problems with the allocation of costs the accounting methodology the commission said that the accounting methodology is the one that we're going to approve in the BPA filing. The BPA filing was about the CT 1487 issue they didn't do anything about it I think the difficulty with your argument on that though is that of course they wanted to preserve the rights they had it doesn't necessarily mean they thought that was the exclusive right and at the same time Kirk was telling that PG&E had to go, that it really ought to litigate somewhere else that this was another order that related So you can't keep this, you can't do a show you can't do a show game on these parties I would say we're not preventing them from having a petition for review I would say it's not a show game because the thing is they specifically raised it in their request for a re-hearing which was April 25, 2003 when they filed it now the re-hearing order in the refund proceeding came out on October 16, 2003 their petitions for review I believe in this case I mean the the first order in this case that really not the June order but the November 13, 2003 initial order in this specific case saying that we're going with the accounting methodology that was subsequent to the refund proceeding so clearly they had enough time, they were in the refund proceeding and then they basically abdicated their rights there then they're switching over into this proceeding to proceed with it Well there is a question I think about the impact of an order in many of these orders, and it's understandable why it happens because you impact a lot of people but in many of these orders these things are mentioned almost in passing and their true effect becomes apparent later and here we're talking about hundreds of millions of dollars and there really isn't a notice that says to these people in clear terms, here's what we're doing and we're going to apply this new methodology retroactively I would say that in this docket I would say that the energy is out there the entire docket of that proceeding and the BPA proceeding of that ERR 12886 they could have looked at that they knew the issue because they raised their arguments in the refund proceeding in April 25, 2003 before the orders in this case were ever issued so obviously they knew they had problems with the accounting methodology and the CT 1487 situation they then failed to proceed with that in the other appeal that's before the 9th circuit right now they then on this issue they're coming in trying to collaterally attack it it's pure and simple I would say then that we don't need to focus on the retroactive rate making issue or notice this is just a collateral attack situation in which they had their opportunity before the refund proceeding and they failed to progress and proceed with their argument and now are coming here to have truly a second bite at the apple What is your position as to when PG&E had or should have had notice that the commission approved this new methodology? I would say at least in the refund proceeding they knew what was going on with the accounting methodology furthermore, the out of market sales which were in the dockets ER00555 which is amendment 23 and the amendment 33 docket and also the southern cities complaint which was EL00-11 the commission noted a similar issue of how the negative imbalance how the monies would be allocated to the scheduling coordinators who basically caused the load situation and the need for the ISO to make calls out of market calls Now, the EEP is an out of market call it is something that is not in the real time imbalance market it's something extraneous to it so it's they knew that PG&E was involved in those proceedings and PG&E had at least notice of the fact that this methodology would be employed that scheduling coordinators would be the ones who allocated the cost those orders were back in 2000-2001 What do you make of the discrepancy between PG&E claiming the damages of 80-100 million and then 100-200 million later? Well, there would be essentially with the rerun there would be some sort PG&E was getting basically a free ride earlier in the sense that they were the ones who were needing the load they were under scheduling and then under the Charlie Adjustment System the parties that were when the energy was returned to the ISO I mean when the ISO returned the energy everyone paid for it the other market participants were paying for it who may or may not have been the ones who caused the energy But why in one place does it say 80-100 million and in another place it says 100-200 million? Do you know anything about those numbers? No, I don't. The ISO would have an idea of what the rerun calculations would amount to I will say that in the refund proceeding they made the claim that it was somewhere around that there would be a shift of allocation of around $250 million Who's they? PG&E? PG&E was one of the California parties and their request for a re-hearing they made the argument that the accounting methodology switch would reallocate up to $250 million for the whole group Thank you If you have no other questions Thank you I'll give you five minutes First Your Honor, just to address the number discrepancy issues in the excerpts of record page ER0038 which is attached to PG&E's opening brief is a copy of the ISO filing in Amendment 51 where there's a chart that describes the impact of the various changes that were proposed in Amendment 51 and it's the ISO's chart that identifies a market-wide impact of $100-200 million I believe that the $80-100 million was an estimate of the impact on PG&E alone So the ISO was shifting around overall $100-200 million in charges but the impact on PG&E and note that whenever I say PG&E I mean PG&E's rate payers because all of these costs are passed on to PG&E's rate payers So the impact on PG&E's rate payers is tens of millions of dollars I don't know the exact amount but it's tens of millions of dollars the shift of what they did I think that Judge Tashima asked an important question which was slightly different than the questions he asked initially when he said, when did we first learn that FERC was adopting the new methodology not when did the ISO first propose it but when did we first learn that FERC was going to adopt it and that's an interesting question because in this docket, this order that came out October 17, 2001 where the ISO made its filing FERC said it was going with the neutrality adjustment charge methodology that's the methodology we wanted in docket ER-012886 In the December 12, 2002 order that FERC cites in the refund proceeding paragraph 536, that's at 101 FERC 63026 and again that's paragraph 536 I think it's about an 800 paragraph order they addressed this issue the judge found that the methodology should be used as the methodology as set forth in the energy exchange agreement with BPA in docket number ER-012886 of course that's wrong, there is no methodology spelled out in the agreement with BPA, it was only spelled out in the cover letter of the filing but what was adopted by FERC in ER-012886 is as I say below, as it says there the neutrality adjustment charge method so it wasn't clear when the judge ruled that we were getting stuck with the wrong method in fact he referred back to the order where the right method was used the right method from our view How do you respond to Mr. Lee's comment that he said in your reply brief previously you challenged the methodology but then you let it drop there and then didn't bring it up in your petition for review I mean if you're challenging it in that proceeding then you don't choose to take it forward it would certainly seem that you had knowledge of it Your Honor, in the refund proceeding there was an implication in FERC's orders that it was ruling against us and it suggested it was ruling against us but then it went on to say that it was adopting the methodology from ER-012886 and again, this is the only order that's ever come out in ER-012886 and this order refers to no acceptance of any methodology other than the neutrality adjustment charge methodology which is the one we want so for instance in the October 16, 2003 order that they reference, and the only place the issue comes up there is footnote 17, FERC says we clarify that the Commission's prior approval of the ISO's accounting methodology for energy exchange transactions in ER-012886 is to be applied to all jurisdictional entities that are similarly situated but again, we're okay with the methodology that's spelled out in the order that came out in ER-012886 so it's never been clear it's never been clear, and FERC has never been clear that it was changing the methodology from the neutrality adjustment charge methodology and quite frankly, the only place it became clear was when finally in ruling on tariff amendment 51 FERC clarified that it was adopting a change in methodology from the neutrality adjustment charge methodology to some other CT-1487 we have no name for the methodology because there's nothing in the tariff that describes it. Look at section 11.2.9 of the tariff though, and you'll find the neutrality adjustment charge methodology and it's part of the tariff it's a default provision that covers charges that don't fit anywhere else which is exactly what the energy exchange charges are and that's why that's the provision that was in the tariff at the time the service was taken and it's the provision that should be applied absent retroactive rate making thank you thank you, your honor Mr. Warren thank you, your honor just a couple of brief matters I believe it was Judd Callahan that asked about the authority to pursue this matter the ISO's assertion of authority is in section 11.6.3 of the ISO tariff which authorizes the reruns if you look at that section and that appears on page 46 of the appendix the ISO's initial brief which is a subject to the motion for judicial notice that section does not require FERC authority it does not require that there exists a violation of the MMIP which is what FERC was investigating I believe the MMIP is the market monitoring and investigation protocol although I'd have to check afterwards precisely in response to I guess you should just go home and adjust the tariff and see what happens I guess you feel you can't because of the in response to your previous question which is the ISO has not pursued this matter on its own because the commission instructed us we could not conduct that rerun and what the ISO tariff did instead So are they interpreting that tariff when they tell you that you can't do it? They denied our ability on amendment 6051 we asked for this invoicing settlement process we said we were going to use that in connection with 17 reruns under the tariff not as violations of the MMIP reruns under our tariff and they said you cannot conduct that ancillary services rerun So if they're telling you that you don't have the authority and you're asking to say well we do then what sort of deference are they entitled to in making that determination that you don't have the authority? They didn't make a determination they never made that explanation I guess I'm feeling like it's like I'm arguing with your children and they go well what do you mean by no? I'm hearing you say well they told us we can't do it but they didn't tell you you didn't have authority they just said you can't do it They said we can't do it and we explained to them why their previous investigation was not relevant to this one and they just turned around and said no we've decided what to investigate you can't do it It really doesn't get down to whether they have the authority to do that in the context of the enforcement proceeding and you've raised other issues in your brief about decision making and so forth but if they have the authority in the context of an enforcement proceeding to tell you not to enforce it and that's protected or committed to their discretion then that's probably the end of the argument and if they don't have the authority then proceed I would suggest they do not have the authority to tell us we can't do it except by proceeding under section 206 of the tariff through their own ability to change our tariff we however were faced with an order that said that and we pursued that on rehearing an appeal which I believe is the appropriate methodology to do so Thank you all for your arguments we haven't talked about this case yet if we decide to hold any part of it or all of it depending on the resolution and the refund or remedy cases we'll let you know promptly and if not we can expect something else Thank you for the fine arguments
judges: Farris, Tashima, Callahan